717 A.2d 439 (1998)
TWC REALTY PARTNERSHIP, Plaintiff,
v.
ZONING BOARD OF ADJUSTMENT OF THE TOWNSHIP OF EDISON, Defendant.
Superior Court of New Jersey, Law Division, Middlesex County.
Decided May 14, 1998.
*440 John Wiley, Jr., Metuchen, for plaintiff.
Jeffrey B. Lehrer, Warren (Bivona, Cohen, Kunzman, Coley, Yospin Bernstein & Di-Francesco, attorneys), for defendant; Mr. Lehrer and Albert E. Cruz, on the brief.
Donald M. Ross, Newton (Dolan and Dolan, attorneys), submitted a Letter Brief on behalf of Amicus Curiae, New Jersey Planning Officials.
*441 David J. Frizell, Metuchen (Frizell, Goldman & Jaffe, attorneys) submitted a Letter Brief on his own behalf, as Amicus Curiae.
WOLFSON, J.S.C.
In this zoning case, TWC Realty Partnership ("TWC") challenges the Edison Zoning Board's refusal to review the merits of its use variance application to construct a multi-unit congregate care housing facility for the elderly on a 23+ acre parcel in the 2200+ acre Light-Industrial ("LI") Zone. Instead, based upon its interpretation of Township of Dover v. Board of Adjustment of the Township of Dover, 158 N.J.Super. 401, 386 A.2d 421 (App.Div.1978), the Board determined that it lacked jurisdiction to adjudicate the merits of the development application. While Dover, supra, 158 N.J.Super. at 405, 386 A.2d 421, is, by its own analysis, a standing case[1], dictum within the opinion has spawned a confused and inconsistent approach by zoning boards which have attempted to resolve questions concerning their own jurisdiction. This issue is of particular significance because it confronts the potential conflict between the board of adjustment's power to grant use variances and the governing body's power to zone.[2] Because no subsequent Appellate decision has squarely addressed the manner and extent to which zoning boards may act with regard to their own jurisdiction, and since the reported trial court decisions pre-date significant developments in the field of land use law, I must determine whether the Board's refusal to hear and decide the merits of TWC's variance application was authorized by the Municipal Land Use Law ("MLUL"), N.J.S.A 40:55D-1 to 129. For the reasons articulated below, I conclude that it was not.

II. FACTUAL AND PROCEDURAL BACKGROUND
In its application, TWC proposed to construct a congregate care housing facility for the elderly in three five-story buildings. As proposed, each building contained approximately 167 units. Twenty percent, or 100 of the units, were to be set aside as Mount Laurel units, to be developed under recognized affordable housing guidelines. Over 400 parking spaces were proposed.
The contemplated community facilities included libraries, lounges, a convenience/gift shop, kitchen/dining areas, a beauty parlor, an activity area, as well as physical therapy and medical facilities. Outdoor recreational facilities, including two tennis courts, a large swimming pool and pool house, two putting greens, and a shuffle board court were also contemplated. This self-contained community was to be known as Raritan Village.[3]
In October, 1994, approximately two months after the application was filed, the Board first questioned the propriety of entertaining the application. Because of the breadth of the application, its size and intensity, and the extent to which it deviated from the standards of the light industrial zone, the Board apparently believed that it lacked jurisdiction to hear the application, although no formal resolution to that effect was adopted.
A revised application was thereafter submitted in March, 1996. On May 28, 1996, following the Board's determination of "completeness," see N.J.S.A. 40:55D-10.3, the Board held a hearing, although its focus was not the merits of the application, but rather, whether under the Dover case, it could decline to review the application in the *442 first instance.[4] Thereafter, utilizing certain of the criteria articulated in Dover, 158 N.J.Super. at 412-13, 386 A.2d 421, the Board concluded that it could, and dismissed the application, citing the lack of jurisdiction as the basis for its decision. In so deciding, the Board reasoned that because the request for relief was so expansive[5], it was tantamount to a request for a rezoning of the parcel, which, under the enabling legislation, was a power vested exclusively in the Governing Body. See N.J.S.A. 40:55D-26 and -62. This, coupled with the well-established principle that a local board's decision carries with it a presumption of validity, encompasses the essence of the Board's argument.

III. DELINEATION OF POWERS AND SCOPE OF REVIEW
The Board of Adjustment is an independent administrative agency whose authority is derived from the Legislature via the Municipal Land Use Law ("MLUL"), N.J.S.A. 40:55D-1 to 129, the enabling authority which authorizes and defines the limits of a municipality's procedural and substantive power to regulate land development within its borders. Within this regulatory framework, the Board of Adjustment is vested with the primary authority under N.J.S.A 40:55D-70d to determine whether variances should be granted, and ancillary powers to grant site plan and subdivision approvals in conjunction therewith. See N.J.S.A 40:55D-76b. These delegated powers may not be exercised by any other body. See, e.g., Cronin v. Township Committee, 239 N.J.Super. 611, 571 A.2d 1354 (App.Div.1990) (governing body's determination regarding existence of non-conforming use deemed ultra vires since authority to a adjudicate this issue is vested exclusively with the zoning board); see also N.J.S.A 40:55D-20.
In recognition of the fact that local officials are presumed to be "thoroughly familiar" with their community's characteristics, zoning board decisions, when factually grounded, are ordinarily cloaked with a presumption of validity, allowing the board wide latitude in the exercise of the discretion delegated to it. Ward v. Scott, 16 N.J. 16, 23, 105 A.2d 851 (1954); Pullen v. So. Plainfield Planning Bd., 291 N.J.Super. 303, 312, 677 A.2d 278 (Law Div.1995), aff'd, 291 N.J.Super. 1, 6, 676 A.2d 1095 (App.Div.1996). On the other hand, however, a board's decision regarding a question of law, such as the scope of its own authority or jurisdiction, is subject to a de novo review by the courts, see Grancagnola v. Planning Bd. of Twp. of Verona, 221 N.J.Super. 71, 75-76, n. 5, 533 A.2d 982 (App.Div.1987); New Brunswick Cellular Tel. Co. v. Edison Tp. Zoning Bd., 300 N.J.Super. 456, 465, 693 A.2d 180 (Law Div.1997), and is entitled to no deference since a zoning board has "no peculiar skill superior to the courts" regarding purely legal matters. Jantausch v. Bor. of Verona, 41 N.J.Super. 89, 96, 124 A.2d 14 (Law Div. 1956), aff'd, 24 N.J. 326, 131 A.2d 881 (1957); Pagano v. Zoning Bd. of Adjustment, 257 *443 N.J.Super. 382, 396-97, 608 A.2d 469 (Law Div.1992).
While the Board of Adjustment is empowered with quasi-judicial authority to adjudicate requests to deviate from the established zoning scheme, it remains the responsibility of the governing body to create the zoning scheme in the first instance through the adoption of comprehensive land use regulations. See, e.g., N.J.S.A 40:55D-62 (power to zone), -32 (adoption of an official map), -37 to -42 (adoption of ordinances to regulate subdivisions, site plans, and off-tract developer contributions) and -45 (ordinances authorizing planned developments). "It is the governing body's ultimate responsibility to establish, by the adoption of its zoning ordinances and amendments thereto, the essential land use character of the municipality." Dover, 158 N.J.Super. at 411, 386 A.2d 421; see N.J.S.A. 40:55D-62.

IV. THE ZONING BOARD'S AUTHORITY
Once created, a Zoning Board shall exercise the power delegated to it in Article 9 of the MLUL, (N.J.S.A. 40:55D- 69 to -76).[6] The Board's original jurisdiction requires it, in the first instance, to assess the "completeness" of a proposed development application. See, N.J.S.A. 40:55D-10.3. Once the application has been deemed complete, however, the Board "shall grant or deny approval of the application (emphasis added)" within 120 days. N.J.S.A. 40:55D-76c.[7] By its own terms, the statute does not speak in permissive terms, but rather mandates either an approval or a denial of the application. Id; see also Manalapan Holding Co. v. Hamilton Tp. Pl. Bd., 92 N.J. 466, 482, 457 A.2d 441 (1983) ("[W]e do not countenance a permissive interpretation or application" of the statute, and no "waiver or relaxation of its terms" may be implied). Indeed, the board's failure to act within the time period prescribed, "shall constitute approval of the application" N.J.S.A. 40:55D-76c (emphasis added); see also Manalapan Holding, Co., supra, 92 N.J. at 482, 457 A.2d 441.
Because the MLUL does not explicitly authorize the Board to skirt its jurisdictional mandate to hear and decide a "complete" development application, the Board cites to decisional authority in an effort to buttress its position, relying primarily on the Dover case, supra, 158 N.J.Super. at 401, 386 A.2d 421. There, the Appellate Division confronted the issue of whether a municipal governing body had standing to challenge a Board of Adjustment's grant of a variance on the ground that the relief granted was so expansive in nature and impact as to have infringed upon the governing body's exclusive power to zone. See id. at 405, 386 A.2d 421 (emphasis added). In holding that the governing body had standing to challenge the Board's alleged arrogation of its authority, the court reversed and remanded the matter for trial, identifying the factors to be considered by the trial court in adjudicating the contentions of the governing body.[8] Contrary. to the assentions of the Board, Dover never contemplated the board reserving unto *444 itself the authority to dismiss an application without deciding the merits. Indeed, the specific issue raised in that case can arise only if the board grants the requested relief. Absent an approval by the Board, there would be nothing against which to apply the Dover factors: by its own terms, there could be no "jurisdictional" encroachment and no need for standing to be conferred upon the governing body.
The illogic of the Board's position in this case is further illustrated by Robinson v. Board of Adjustment of Cape May, 131 N.J.Super. 236, 329 A.2d 351 (Law Div.1974). There, Judge Gruccio addressed whether a Board of Adjustment could lawfully refuse to consider a variance application by characterizing the request as an amendment to the zoning ordinance. Id. As determined by the court: "[w]here a person submits a colorable application for a variance, the zoning board must consider the application, take evidence, and consider the evidence in light of the statutory criteria in making ... [its] decision," reasoning that "[n]o where in the statute or in the cases construing the statute can it be found that a zoning board is free to determine upon application ... that it did not have the jurisdiction to hear this application." Id. at 242, 329 A.2d 351 (emphasis added).
Although decided under the MLUL's predecessor statute, N.J.S.A. 40:55-39d (repealed), Robinson's rationale is no less-persuasive today.[9] When the Legislature adopted the MLUL in 1975, Robinson had already been decided. Where specific legislation has been interpreted by the courts, and the legislation is subsequently re-enacted without any substantive change to the interpreted sections, there is a strong presumption that the Legislature intended to leave that interpretation intact. See Quaremba v. Allan, 67 N.J. 1, 14, 334 A.2d 321 (1975). Moreover, the Legislature's consistent refusal to provide for a "jurisdictional hearing" within this comprehensive statutory framework (or, for that matter, to adopt a procedure for requesting a zone change), has remained steadfast for over 20 years, despite numerous amendments to the MLUL. In fact, as recently as 1997, the Legislature enacted L.1997 c. 145, which amended the specific section at issue in this case, N.J.S.A. 40:55D-70, in order to incorporate additional language relating to the so-called "negative criteria" and its applicability to "inherently beneficial" uses. Where legislation is remedial in nature, and changes are made in other particulars, without changing phraseology construed in prior judicial decisions, the presumption that the Legislature intended to leave the existing judicial interpretations intact, is even stronger. See Quaremba, supra, 67 N.J. at 14, 334 A.2d 321. These principles of statutory construction, along with the MLUL's affirmative, mandatory language, requiring local boards to "grant or deny approval" of each application for development, further undermine the Board's restrictive view of its own power.
Cases decided subsequently to Dover are not to the contrary. Each of the several cases referenced by the Board which addressed the jurisdictional issue, did so in the context of a variance having been granted. For example, in Feiler v. Fort Lee Board of Adjustment, 240 N.J.Super. 250, 256-57, 573 A.2d 175 (App.Div.1990), the Appellate Division concluded that the zoning board, in granting the variances there sought, "blatantly arrogated to itself the power to reject existing zoning and to substitute its idea of an appropriate zone plan." In describing the "mischief" that would otherwise ensue, Judge D'Annunzio explained that the board's grant "effected a de facto rezoning of the entire district, thereby exercising a power delegated to the governing body." Id. at 256, 573 A.2d 175. Since the alleged difficulty with the zoning was general to the district as a whole, the variance should not have been granted. See id. The Appellate Division never held that the zoning board was precluded from hearing or denying the application.
*445 Similarly, in Vidal v. Lisanti Foods, Inc., 292 N.J.Super. 555, 564, 679 A.2d 206 (App. Div.1996), the Appellate Division reversed the grant of a use variance which it determined "constituted an arrogation of the power to rezone." Concluding that the board's approval of the use variances would have substantially altered the character of nearly the entire zone district, Judge Skillman explained that the MLUL did not intend to expand the zoning board's power to grant use variances in the event that the governing body defaults in the performance its statutory responsibilities to adopt reasonable zoning regulations. Id. at 566, 679 A.2d 206. Nor did this court hold the board to be powerless in this regard. Indeed, its conclusion that neither the applicants nor the board (through its written resolution) identified any "special reason" that "would justify use variances," (id. at 565, 679 A.2d 206), is language warranting denial, not language precluding review.
Although it involved a request for a c(2) variance from the planning board, the Board also relies on Chesterbrooke Ltd. v. Planning Board of Chester, 237 N.J.Super. 118, 131, 567 A.2d 221 (App.Div.), certif. denied, 118 N.J. 234, 570 A.2d 984 (1989). There, the court held that a planning board could not, on its own initiative, implement the "flexible" subdivision standards authorized by N.J.S.A. 40:55D-40b, when the Township, in the exercise of its discretion, had declined to adopt such an ordinance. The board's attempt to apply a non-existent "cluster" ordinance, based upon its "own idea of what [the] municipal development regulations should be," id. at 130, 567 A.2d 221, was nothing less than a blatant act of legislation. Given those egregious circumstances, Chesterbrooke has little applicability to the present case.
Finally, the Board's reliance on Cranmer v. Township of Evesham, 162 N.J.Super. 204, 214-15, 392 A.2d 630 (Ch.Div.1978), for the proposition that the Board possesses statutory authority to hear and determine questions relating to its jurisdiction, is also misplaced. Although there are no doubt circumstances where this is so,[10] to the extent that Cranmer suggests that a zoning board may refuse to review the merits of a complete development application, I respectfully disagree. A rule such as that espoused by that trial court would, of necessity, result in many delays, additional litigation and probable remands, and would plainly subvert the purposes of the MLULto encourage prompt consideration and disposition of land use applications, avoid unnecessary delays and repetition of effort, and to "encourage coordination of the various public and private procedures and activities shaping land development," with a view toward "lessening the cost of such development" and to achieve a "more efficient use of land." See N.J.S.A 40:55D-2(a) & (m); see also Levin v. Tp. of Parsippany-Troy Hills, 82 N.J. 174, 178-79, 411 A.2d 704 (1980); Manalapan Holding Co., supra, 92 N.J. at 473, 457 A.2d 441.
In both the Dover (158 N.J.Super. at 413-14, 386 A.2d 421) and Cranmer (162 N.J.Super. at 215, 392 A.2d 630) decisions, for example, the trial courts were required to conduct evidentiary hearings relating to the claimed (or threatened) arrogation of authority. Since there is no specific procedure delineated in the MLUL to guide the format of such a hearing, extensive litigation similar to that which occurred in those cases, will undoubtedly be waged on many fronts, while the trial and appellate courts struggle to develop acceptable methods and procedures.[11]
*446 Nor can the Board identify any discernible benefits associated with a jurisdictional hearing. To the contrary, given the strong probability that an adverse jurisdictional finding will result in a plenary, declaratory judgment type trial in the Superior Court (the procedure utilized in Cranmer), bifurcation cannot be said to result in any economy of effort, nor will it likely result in any reduction in public expenditures. Instead, the Board's position substantially increases the risk of an additional lawsuit being waged at the public's expense. Moreover, the proofs required to assess the "jurisdictional" issue are virtually identical to those needed to satisfy the so-called "negative criteria" of N.J.S.A. 40:55D-70, that the variance, if granted, "will not substantially impair the intent and purpose of the zone plan and zoning ordinance." In fact, the trial judge in Cranmer, supra, viewed the negative criteria and the standards articulated in Dover to be one and the same.[12] Since the proofs are, for the most part, indistinguishable, no significant burden is imposed by requiring a board to address the merits of an application.
This is especially so where the proposed use has been recognized as "inherently beneficial" by the courts. Since, the positive criteria, "special reasons," will, under those circumstances be deemed satisfied as a matter of law, see Sica v. Board of Adjustment of Tp. of Wall, 127 N.J. 152, 165-66, 603 A.2d 30 (1992), virtually the entire hearing would relate to whether the negative criteria can be satisfied and whether any perceived detriments stemming from the use can be reduced or eliminated by the Board's imposition of reasonable conditions. Consequently, an applicant's inability to meet the Dover standards, of necessity, compels a conclusion that the applicant has failed to satisfy the negative criteria. On the other hand, where the negative criteria has been satisfied, the "jurisdictional" issue will obviously be moot. In either situation, the merits of the application are likely to be resolved in a prompt and efficient manner.
The folly of the Board's position becomes even more apparent when the "inherently beneficial" status of the proposed facility is considered. Where, as here, the requested variance involves an inherently beneficial use, our Supreme Court has directed that municipalities engage in a four-step procedure in assessing whether the grant of the variance will cause a substantial detriment to the public good. See Sica, supra, 127 N.J. at 164-66, 603 A.2d 30. First, the Board is required to identify the public interest at stake. Second, it must identify any detrimental effect which it perceives would result if the variance were granted. Third, in order to reduce any perceived detrimental effect, the Board must, if practical, impose reasonable conditions on the use. Finally, the Board must weigh the public interests being advanced against what remains of the negative criteria, and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good. Id. at 165-66, 603 A.2d 30, see also Cellular Tel. Co. v. Edison Tp. Zoning Bd., supra, 300 N.J.Super. at 468, 693 A.2d 180. This balancing procedure, (specifically the municipality's obligation to reduce the project's negatives where possible, by imposing reasonable conditions), "properly" renders it *447 "more difficult" for municipalities to exclude inherently beneficial uses. Sica, supra, 127 N.J. at 166, 603 A.2d 30; see also New Brunswick Cellular Tel. Co. v. Old Bridge Tp. Planning Bd., 270 N.J.Super. 122, 138, n. 14, 636 A.2d 588 (1993).
Given "the heightened judicial scrutiny of municipal attempts to exclude inherently beneficial uses," (New Brunswick Cellular, supra, 270 N.J.Super. at 138, 636 A.2d 588; Cellular Tel. Co., supra, 300 N.J.Super. at 469, 693 A.2d 180), the Board's position is simply untenable. To hold otherwise would inevitably lead to anomalous results, since the Board could dismiss on jurisdictional grounds the very same project that it would be legally bound to approve, after properly applying the Sica balancing test. Indeed, TWC's proposed congregate care facility for the elderly presents a perfect case in point. If the Board were required to impose reasonable conditions, it is probable that many, if not all of the identified "problems" associated with the project would have either been eliminated, or reduced. Such conditions of approval might, for example, have required: fewer units (to reduce traffic and municipal services), fewer buildings at reduced heights (to reduce visual impact); fewer parking spaces (to reduce ground water run-off, non-source point pollution, and drainage difficulties), as well as increased buffers and landscaping (to enhance aesthetics and open space). If such conditions were imposed prior to the Board's application of the Sica balancing analysis, the Board might have been hard pressed to deny the use variance outright. This would be especially so where an applicant elects to bifurcate its requests for site plan or subdivision approval pursuant to N.J.S.A. 40:55D-76b, presenting for the Board's consideration instead, a variance application which leaves many of those details to be resolved during the subsequent site plan or subdivision hearing.
Inasmuch as the Supreme Court has specifically stated that inherently beneficial uses "should have the right to locate on any appropriate site where the physical impact of their operations can be alleviated to a reasonable extent by the imposition of suitable conditions and restrictions," Sica, 127 N.J. at 163, 603 A.2d 30, relieving a municipal Board of its "amelioration and balancing obligations" would certainly "violate the spirit, if not the precise rationale of Sica." New Brunswick Cellular, supra, 270 N.J.Super. at 138, 636 A.2d 588; Cellular Tel. Co., supra, 300 N.J.Super. at 469, 693 A.2d 180; see also Roman Catholic Diocese of Newark v. Bor. of Ho-Ho-Kus, 47 N.J. 211, 221-22, 220 A.2d 97, (1966) (Hall, J., concurring). After more than 30 years, Justice Hall's considerable insights in this regard are still enlightening:
Regional or, for that matter, local institutions generally recognized as serving the public welfare are too important to be prevented from locating on available, appropriate sites, subject to reasonable qualifications and safeguards, by the imposition of exclusionary or unnecessarily onerous municipal legislation enacted for the sake of preserving the established or proposed character of a community or some portion of it *** or to further some other equally indefensible parochial interest. And, of course, if one municipality can so act, all can, with the result that needed and desirable institutions end up with no suitable place to locate. Id., 47 N.J. at 223, 220 A.2d 97.
Permitting the rejection of inherently beneficial uses on "jurisdictional" grounds will inevitably result in a return to bygone days not seen for more than 30 years. Absent clear statutory authority or, at least, some significant, concomitant benefit to the general welfare, the Board's position should not be judicially sanctioned.
In this regard, the Board additionally argues that because TWC's application does not relate to a "specific piece of property," and is not a "particular case," it is outside the scope of the variance power. N.J.S.A. 40:55D-70. The validity of this "conclusion" ultimately depends upon "whether the impact of the requested variance will be to substantially alter the character of the district as that character has been prescribed by the zoning ordinance." Dover, 158 N.J.Super. at 412-13, 386 A.2d 421. The factors to be considered would, of course, include the *448 size[13] of the property itself, although size alone is not a determinative factor. See, e.g., Kunzler v. Hoffman, 48 N.J. 277, 225 A.2d 321 (1966) (grant of use variance to permit 40 acre tract to be utilized for a hospital for the emotionally disturbed). Indeed, the Appellate Division itself acknowledged in the Dover case that the 81 acre project would be sustained unless the trial judge concluded that the board "transcended its variance authority." 158 N.J.Super. at 414, 386 A.2d 421. Consideration would also be given to the size of the parcel in relation to the zone district and to the municipality as a whole, the number of parcels (if a subdivision is proposed), and the nature, degree and extent of the variation from the district regulations. "The test of whether a board has been engaging in proscribed legislation must ultimately be one of both geographic and functional substantiality vis-a-vis the plan and scheme of the municipality's zoning ordinance." Id. at 413, 386 A.2d 421. Thus, the factors needed to determine whether the board has "jurisdiction" are the same as those which are assessed in determining whether to grant or deny a variance on the basis of the negative criteria. Accordingly, where the board determines that the characteristics of the project are such in relation to the other properties in the district or the municipality, or if the nature, degree and extent of the variation from the district regulations is so significant, that the grant of a variance would result in substantial detriment to the zone plan or zoning ordinance, the board's responsibility is to deny the application, setting forth its reasons in a written resolution that reflects "the deliberate and specific findings of fact necessary to sustain its conclusions." Pagano v. Zoning Bd. of Adjustment, 257 N.J.Super. 382, 392, 608 A.2d 469 (Law Div.1992); see also Medici v. BPR Co., 107 N.J. 1, 25, 526 A.2d 109 (1987); Harrington Glen, Inc. v. Mun. Bd. of Adj. of Bor. of Leonia, 52 N.J. 22, 28, 243 A.2d 233 (1968).
Practical considerations also weigh heavily against following the path urged by the Board. There is a possibility, (however slight), that a zoning board might erroneously have dismissed an application on jurisdictional grounds.[14] Under such circumstances, the absence of a fully developed record addressing the negative criteria (and, in the case of an inherently beneficial use, one that carefully explores the availability of reasonable conditions designed to ameliorate any adverse impact) would necessarily result in a remand, requiring the board to conduct an entirely new hearing. Formal notice of the public hearing on the application, pursuant to N.J.S.A. 40:55D-12, would be required. Much of the same ground covered in the "jurisdictional" hearing would once again be the subject of expert testimony. These are hardly circumstances resulting in an economy of effort, one of the MLUL's most important goals. See Lizak v. Faria, 96 N.J. 482, 496, 476 A.2d 1189 (1984) (MLUL designed to encourage prompt consideration and disposition of land use applications for the advancement and protection of both developers and the public). Starting the process all *449 over again under such circumstances would not serve the interests of the public, the Board, or the applicant. Cf. Pagano, supra, 257 N.J.Super. at 400, 608 A.2d 469 (substantial prejudice likely to accrue by virtue of protracted delays in the development application and litigation processes). Certainly the resulting increased costs could be significant, not only to the developer, but also to members of the public who may have appeared (possibly supported by experts) and objected vigorously at the "jurisdictional" hearing, believing that the matter was concluded. Thus, not only is it manifestly apparent that a "jurisdictional" hearing fails to advance any legitimate public policy purposes,[15] but it is equally evident that it "undermines" them as well.

V. CONCLUSION
Absent a clear expression of legislative intent to the contrary, and for the reasons expressed herein, I am satisfied that the Board's refusal to hear the merits of TWC's variance application was unauthorized under the MLUL. The Board's decision below, dismissing TWC's use variance application based upon the purported lack of jurisdiction is, therefore, reversed, and the Board is directed to hear and decide the merits of the application, as well as any and all requests for ancillary relief, in accordance with its statutory and quasi-judicial obligations. In rendering this decision, I express no opinion with respect to the merits of those applications.
Costs to plaintiff.
NOTES
[1] As noted by Judge Pressler in the very first sentence of her opinion, "The single issue before us is whether a municipal governing body has standing to challenge, ..., the grant by the municipality's board of adjustment of a bulk variance... (emphasis added)." Id. at 405, 386 A.2d 421.
[2] The New Jersey courts have been acutely aware of this conflict and have addressed it several times. See Medici v. BPR Co., 107 N.J. 1, 526 A.2d 109 (1987); Sica v. Board of Adjustment of Township of Wall, 127 N.J. 152, 161-62, 603 A.2d 30 (1992) (Medici's enhanced quality of proof standard was intended, in part, to minimize conflicts between the Board of Adjustment and the governing body); and see also, Township of Dover v. Board of Adjustment, supra, 158 N.J.Super. at 401, 386 A.2d 421.
[3] In addition to needing a use variance under 40:55D-70d(1), the project required other variances as well, due to the buildings' excessive height [-70d(6)] and floor area ratio[-70d(4) ].
[4] Applicant's counsel below urged, without success, that a "Dover hearing" was not available where the proposed use was "inherently beneficial." Clearly, the proposed congregate care housing facility for the elderly, with or without a Mount Laurel component, qualifies as an inherently beneficial use under New Jersey case law. See, e.g., Jayber, Inc. v. Municipal Council of Township of West Orange, 238 N.J.Super. 165, 174-75, 569 A.2d 304 (App.Div.1990) (for-profit senior citizen congregate-care facility); Urban Farms, Inc. v. Borough of Franklin Lakes, 179 N.J.Super. 203, 212, 431 A.2d 163 (App.Div.) certif. denied, 87 N.J. 428, 434 A.2d 1099 (1981) (a 120-bed nursing home). Indeed, the promotion of community housing for the elderly is one of the specifically enumerated "purposes of the act." See N.J.S.A 40:55D-2(1). While perhaps not dispositive, the project's "inherently beneficial" status is not without significance. See section IV, infra, at 219-21, 717 A.2d at 446-47.
[5] The Board's planner opined that the size and location of the proposed development (23.24 acres, located at the north edge of the former Raritan Arsenal site) made it incompatible with the surrounding areas, although the arsenal site is, itself, comprised of some 2,200+ acres and contains major industrial parks, the Environmental Protection Agency Laboratory, and Middlesex County College. To put the size of the proposed senior housing in its proper perspective, it is approximately one-fifth (1/5) the size of one of the industrial parks. The entire arsenal site is about point one percent (.1%) of the land mass of the municipality. Nonetheless, the planner viewed the project to be a threat to the economic "cornerstone" of the Township and the region.
[6] As defined in N.J.S.A. 40:55D-3, the term shall "indicates a mandatory requirement," while the term may "indicates a permissive action."
[7] Consistent with the provisions of this section, the developer may, at its option, elect to submit a separate application for any site plan or subdivision approval sought in connection with the "d" variance request. If granted, the variance shall be conditioned upon the grant of all subsequent approvals by the zoning board. Id.
[8] The entire thrust of the Dover decision is that "the board of adjustment is an independent administrative agency whose powers stem directly from the Legislature and hence are not subject to abridgment, circumscription, extension or other modification by" and therefore is ordinarily "Immune" from, direct or indirect interference by the governing body. 158 N.J.Super. at 408-09, 386 A.2d 421. As instructed by the Appellate Division there, if, on remand, the trial court determined that the board had not "transcended" its variance authority, the township would be foreclosed from attacking the grant on its merits since such an attack would constitute "an impermissible encroachment ... upon the autonomy of the board of adjustment." Dover, supra, 158 N.J.Super. at 414, 386 A.2d 421. This rationale is plainly at odds with the Board's interpretation of Dover in the present case. By refusing to decide the merits of the pending development application, the Board not only, foreclosed the possibility that an approval would have been sustainable, but at the same time, it precluded the trial court from addressing the merits as well.
[9] Although the Board questions the precedential weight of Robinson, it was cited approvingly by the Appellate Division as recently as 1996, in Elco v. R.C. Maxwell Company, 292 N.J.Super. 118, 127, 678 A.2d 323 (App.Div.1996), for the proposition that local boards are independent and autonomous, a principle very similar to that embraced by the Appellate Division in Dover.
[10] Undoubtedly, a board can resolve its own jurisdiction regarding purely legal matters. Thus, for example, a planning board would lack jurisdiction to hear a development application which seeks relief pursuant to N.J.S.A. 40:55D-70d. Likewise, in accordance with N.J.S.A 40:55D-60, a zoning board would lack jurisdiction to adjudicate an application for site plan approval (unaccompanied by a request for a "d" variance). Jurisdictional determinations such as these, which are purely legal in nature, and do not require a plenary or evidentiary hearing, are inherently proper.
[11] The more readily apparent questions requiring judicial resolution could include:

(A) whether an applicant must exhaust administrative remedies and subject itself to a jurisdictional hearing before the local board, especially where a negative result is foreseeable or anticipated, before, or instead of, opting to file a declaratory judgment action in the Superior Court;
(B) whether, formal, public notice of such a "hearing," as contemplated by N.J.S.A. 40:55D - 12, is mandated;
(C) whether there is any time period within which the zoning board is compelled to render its jurisdictional decision, and what amount of time that should be;
(D) whether any of the MLUL's automatic approval provisions, which vary according to the type of application and the acreage involved, apply;
(E) whether interested parties are entitled to be heard at any point during the jurisdictional hearing, and to what extent may contrary evidence be introduced;
(F) whether a local board's acceptance of jurisdiction is subject to review by a governing body in the context of a section 17 appeal;
(G) whether bifurcation of the application (see N.J.S.A. 40:55D - 76b) by the developer affects the scope of, or eliminates the need for, the jurisdictional hearing; and
(H) whether a different jurisdictional standard should be applied for variances qualifying as inherently beneficial.
Although not exhaustive, these rather thorny issues do illustrate the probable breadth of litigation which would likely ensue if the Board's position were to be accepted in this case.
[12] Referring to the negative criteria as "the language of jurisdiction," Judge Haines thus acknowledged that boards "necessarily consider the standards of Dover whenever they address a variance application." Cranmer, supra, 162 N.J.Super. at 214, 392 A.2d 630.
[13] In addition, the MLUL expressly contemplates that the board will handle applications involving substantial acreage through its ancillary powers. See N.J.S.A. 40:55D-76b, see, e.g., N.J.S.A. 40:55D-46c (setting time period for site plan approval on tracts in excess of 10 acres); -52b (protection against zoning changes for planned developments in excess of 50 acres, and for conventional site plan or subdivision applications in excess of 150 acres). Indeed, the zoning board has exclusive authority to grant variances pertaining to conditional uses under -70d(3), which historically have included approvals for large scale items such as golf courses, hospitals and institutions of higher learning, planned retirement communities, and clustered (or other high density) residential developments.
[14] This adjudication would probably require an evidentiary, hearing in the context of a declaratory judgment action in the Superior Court, which at a minimum would entail an exchange of expert reports and/or depositions of the experts. Given the delays inherent in the litigation process, it is unlikely that the matter would be resolved expeditiously. It has also been suggested that permitting the Dover case to be used as a jurisdictional "gatekeeper" will have the rather transparent, practical effect, of insulating the merits of many development applications from judicial review. Since the MLUL contains no procedural framework within which an applicant may compel a municipality to formally grant or deny a requested zone change. (or obtain judicial review thereof) permitting a zoning board to avoid its quasi-judicial responsibilities in this fashion certainly poses an incentive for mischief.
[15] During oral argument, the Board was invited to alert the court to any legitimate reason, whether grounded in public policy or otherwise, that might justify its refusal to review the merits of the variance application. The Board's silence in this regard speaks volumes. In its written submission, however, the Board suggested that a "jurisdictional" hearing was justified because the governing body might otherwise be unaware in a given case that its authority had been arrogated by the zoning board. The argument is specious. In the first instance, if the application is denied, there is no issue. If there is an approval, even if there were no right to appeal the grant of a "d" variance to the governing body (which option is afforded to each municipality, pursuant to N.J.S.A. 40:55D-17a, and which option Edison has selected ), the Board is compelled by N.J.S.A. 40:55D-70.1 to forward to the governing body, "at least annually," a report dealing with the subject of variance requests. See also, Medici, supra, 107 N.J. at 19, 526 A.2d 109 (section 70.1 reflects a legislative policy intended to insure "that the governing body is kept informed of provisions of the zoning ordinance that generate variance requests."). Of course, a board is not precluded from reporting more often, such as in the unlikely event that it grants a variance it believes may have exceeded the scope of its jurisdiction.